# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| GREGORY OWENS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 6:14-cv-03183-NKL ) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) ) |

**ORDER**

Plaintiff Gregory Owens appeals the Commissioner of Social Security's final decision denying his application for disability insurance benefits and supplemental security income. 42 U.S.C. §§ 401, *et seq.,* and 1381, *et seq*. The Commissioner's decision is reversed for further proceedings.

**I.     Background**

This appeal arises after a second hearing of Owens' claims by an administrative law judge and second decision denying his claims. After the first hearing and decision in 20l1, the Appeals Counsel directed that the ALJ obtain additional evidence; obtain evidence from a medical expert if needed to clarify the nature and severity of Owens' impairments, give further consideration to Owens' maximum RFC during the entire period at issue and provide the rationale with specific references to evidence of record in support of assessed limitations; evaluate treating and nontreating source opinions and

explain the weight given such evidence; and obtain supplemental evidence from a vocational expert if necessary. [Tr. 14; 135-137.] The Appeals Council also discussed Owens' treating physicians' opinions and stated that recontact appeared necessary for clarification. [Tr. 22; 135.]

Owens alleges he became disabled beginning December 8, 2009. His impairments include bronchiectasis; asthma; borderline obesity; diabetes mellitus; and a history of leukemia and lower left lung lobectomy. In this appeal, he claims that his impairments result in fatigue requiring him to rest, and the need for frequent medical appointments and treatments, requiring him to be away from the workplace, to such extent that he is not employable.

### A. Medical evidence

Owens was born in 1981. When he was 16, he was diagnosed with acute myelogenous leukemia (AML). His treatments included an initial round of extensive chemotherapy and a second one after relapse; bone marrow transplants; and removal of a portion of a lung. Medical records from 1998 to 2003 reflect hospitalizations and treatment for recurrent pneumonia, graft-versus-host disease, recurrent fungal lung infection, ear infections, eye infections, pancreatitis, and bronchitis. Owens also had borderline test results suggesting cystic fibrosis.

In 2009, Owens saw Brian Kim, M.D., three times. Dr. Kim diagnosed recurrent pneumonia and bronchitis with mucus plugging, history of AML in remission, immunocompromised status with steroid usage, and asthmatic bronchitis. Owens had a CT scan of his chest, and Dr. Kim performed a lung procedure to clear mucus.

2

Case 6:14-cv-03183-NKL   Document 17   Filed 02/10/15   Page 2 of 16

In 2010, Owens had a pulmonary function study. He was also hospitalized for three days and diagnosed with diabetes, for which he was prescribed insulin. He subsequently had seven doctor appointments that year, relating to diabetes management, recurrent pneumonia, fatigue, and breathing problems. He complained of fatigue. One of his doctor visits was in December 2010 with Kristina Kauffman, D.O., to whom Owens went after his endocrinologist, James Bonucchi, D.O., refused to continue to treat him due to his attempts to qualify for Medicaid. Dr. Kaufman's assessment was uncontrolled diabetes mellitus and chronic obstructive pulmonary disease (COPD).

In 2011, Owens had a total of eleven doctor appointments, the majority with Dr. Kaufman, relating to diabetes management; chronic obstructive pulmonary disease (COPD); follow up for his AML; pneumonia; colitis; recurrent bronchitis due to asthma; atelactic changes in the lower left lobe of the lung; and mucus plugging. He complained of fatigue. Testing included two chest x-rays and an echocardiogram. In 2011, he also had two emergency room visits relating to gallstones, and then had surgery to remove his gallbladder.

In 2012, he had a total of at least 20 doctor visits, almost half with Dr. Kaufman, relating to COPD; bronchiectasis; chronic bronchitis; asthma; upper respiratory infection; acute otitis media and bloody discharge from the ears; sinusitis; pseudomonas; coughing and breathing problems; daily sputum production, often purulent; diabetes management, including issues related to taking steroids; and cystic fibrosis symptoms. He complained of fatigue. Testing included several pulmonary function studies, showing moderate lung disease, sometimes improving and sometimes worsening; a six-minute walk test, showing

3

drop in blood oxygen saturation; and CT scan of his sinuses, showing chronic sinus disease. One of his doctor visits took place in August 2012, with James Hargis, M.D., a pulmonologist, who examined Owens for bronchiectasis and asthma, and performed a pulmonary function test. The doctor opined that Owens has significant asthma, requiring frequent treatment and occasional hospitalizations.

Owens was hospitalized for 11 days in April 2012 for cystic fibrosis exacerbation. During the hospitalization, a CT scan was indicative of cystic fibrosis and possible developing pneumonia. He received aggressive antibiotic therapy and aggressive airway clearance therapy. Tubes were placed in both ears. Results of genetic testing following his hospitalization showed a significantly decreased likelihood of cystic fibrosis, notwithstanding his clinical picture.

In 2013, through August, he had seven doctor visits, including three in February and two in March, relating to cough, diabetes management, and acute sinusitis, among other things. He complained of fatigue. Testing included a pulmonary function study, showing lower limits below normal and restrictive lung pattern. One of Owens' visits was with Uzma Khan, M.D., an endocrinologist, who examined him in March on referral by his primary care doctor, Kristina Kauffman, D.O. Dr. Khan prescribed insulin adjustments to treat increases in Owens' blood glucose during periods when he is taking steroids.

### B. Treating physicians' opinions

Dr. Kauffman saw and treated Owens about 16 times from December 2010 to March 2013. In late 2011, Dr. Kauffman prepared a letter opining that due to Owens'

4

two rounds of chemotherapy for AML and difficult-to-control diabetes, Owens' immune system is severely compromised, leading to recurrent pneumonia, and that his partial lung lobectomy leaves him with severe shortness of breath. Dr. Kauffman opined that his constellation of impairments would require a multitude of further treatment to maintain his health. In view of Owens' health concerns and risks, she did not believe it possible for Owens to work. [Tr. 781.]

In 2011, Dr. Kaufmann also completed a Medical Report Including Physician's Certification/Disability Evaluation. She opined that Owens' brittle diabetes, compromised immune system, partial lung lobectomy, and history of AML, lead to anxiety and chronic fatigue which limit Owens' endurance and overall ability to work. Dr. Kauffman opined that Owens has a mental or physical ability that prevents him from engaging in gainful employment, permanently. [Tr. 920-21.]

In August 2012, Dr. Kauffman completed a Medical Source Statement—Physical. The doctor set out limitations on Owens' physical activities, and environmental restrictions due to Owens' respiratory status. The doctor noted that the limitations and restrictions were without regard to Owens' subjective complaints of pain, discomfort or other complaints. Finally, the doctor stated that Owens would need one to two hours of rest at a time after exertion, for coping with his symptoms. [Tr. 1283-86.]

Leonid Shunyakov, MD., a board-certified oncologist and hematologist, saw Owens in October 2010 relating to complaints of fatigue. Dr. Shunyakov prepared a letter in September 2011, describing Owens' history of chemotherapy and bone marrow treatments for AML. The doctor opined that due to the prior treatments, Owens has

5

persistent fatigue, moderate exertional dyspnea, continuous cough, and diabetes, which significantly impact his activities of daily living. [Tr. 779, 782.]

### C. Owens' testimony

Owens was employed as a truck driver until he was diagnosed with insulin-dependent diabetes. Owens testified that he experiences recurring lung infections and that Prednisone, a prescribed steroid, causes elevated blood glucose levels. He uses a nebulizer at four-hour intervals to treat his asthma, which takes 20-45 minutes. He cannot lift and carry heavy objects, or stand and walk for prolonged periods, due to fatigue. He avoids exposure to the public to avoid pulmonary infections.

He is divorced and has moved back in with his disabled father and disabled stepmother. He helps them with chores, including laundry. Because his father's health is not good, Owens helped his father cut wood (to heat the house) five or six times in the three months prior to the hearing. Afterward, Owens felt sick to his stomach and had complete fatigue. Owens takes care of his personal needs himself. He drives, shops, goes to basketball games, and fishes. He camps when friends can come along and take care of setting up.

### D. The consulting and vocational experts' opinions, and the ALJ's decision

Dennis Velez, M.D., a consultant, examined Owens in November 2012. Dr. Velez heard wheezing, but concluded that the remainder of the physical exam was within normal limits. The doctor stated that he found nothing on physical exam relevant to Owens' claim of fatigue. The doctor did opine that Owens' stamina is very much affected as a result of his bronchiectasis and shortness of breath, especially in labor-

6

intensive environments. The doctor opined that some physical limitations were indicated, but that environmental limitations were not applicable.

James McKenna, M.D., a non-examining consultant, testified at the January 2013 hearing before the ALJ. He is board-certified in internal medicine and pulmonology. Dr. McKenna opined that Owens' impairments are borderline obesity; asthma that is not too severe at the present time; bronchiectasis which leads to chronic infections that can linger and be difficult to get rid of, including chronic mucoid pseudomonas which will never be eradicated; and diabetes requiring treatment with injectable insulin. He opined that Owens did not meet any listings.

Dr. McKenna opined that certain functional, physical limitations were appropriate. He also opined that stringent environmental ones were appropriate, including avoiding concentrated exposure to cold, heat, and humidity; respiratory irritants; and moderate vibrations, which could dislodge secretions and cause coughing paroxysms. Because of Owens' bronchiectasis and recurrent infections, he should also avoid exposure to the public and large crowds. Dr. McKenna opined that with the recurrent lung infections, Owens might need to spend time in bed if he had pneumonia, but not necessarily for other infections, such as a bronchial infection, because a "lot of people go to work with bronchitis." [Tr. 70.]

Dr. McKenna stated on cross-examination that when people with asthma get respiratory infections, they are at risk for exacerbation of their asthma. People with bronchiectasis are also at risk for exacerbation, requiring antibiotics and aggressive postural drainage. Such impairments could require a person to take work absences for

7

medical reasons. Dr. McKenna stated that Owens' file did not demonstrate exacerbation of Owens' asthma. Finally, Dr. McKenna agreed that a diabetic person with hyperglycemia could experience dehydration and fatigue.

The ALJ concluded Owens had severe impairments of diabetes mellitus, asthma, bronchiectasis, history of left lower lung lobectomy, history of leukemia, and borderline obesity. He found Owens' subjective complaints were exaggerated and inconsistent with the other evidence. He gave little weight to the opinions of Owens' treating physicians, Drs. Kauffman and Shunyakov, significant weight to the examining consultant, Dr. Velez, and greatest weight to the non-examining consultant, Dr. McKenna.

The ALJ acknowledged that the Appeals Council, in reversing the first decision, had "directed [the ALJ] to recontact physicians to clarify their opinions." [Tr. 22.] But the ALJ did not do so for purposes of the subsequent proceedings, explaining that "[r]ecent changes to the Regulations of the Social Security Administration eliminated this requirement, permitting the Administrative Law Judge to resolve the discrepancies by means of other evidence." [*Id.*, citing 20 C.F.R. 404.1520b and 416.920b.] The ALJ then explained that little weight was given the opinions of Owens' treating physicians, Drs. Kauffman and Shunyakov, because the physicians opined that Owens' "activities of daily living" were compromised by his impairments, but did not define "activities of daily living," "an omission that renders their opinions meaningless." [Tr. 22.] The ALJ also concluded that their opinions were inconsistent with Owens' history obtained in April 2010 by James Bonucchi, D.O., an endocrinologist, reflecting Owens' independence in driving, walking, laundry, bathing, dressing, shopping, grooming,

8

housekeeping, eating, handling finances, taking medications, home maintenance, using the toilet, using the telephone, using public transportation, making health care appointments, and social activities. [*Id.*] The ALJ further "note[d] that Dr. Kauffman is a family practitioner and her opinion appears to be based solely on [Owens'] subjective complaints. In fact, Dr. Kaufman based her opinion largely on a diagnosis of cystic fibrosis, which has been disproved by genetic testing." [*Id.*]

The ALJ concluded Owens could not perform his past relevant work, but had the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except he can lift and carry 20 pounds occasionally and ten pounds frequently, and push and pull the same weights; stand or walk six hours in an 8-hour work day; sit six hours in an 8-hour workday; cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can frequently balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to heat, humidity, and unpredictable hazards; and must avoid even moderate exposure to extreme cold, pulmonary irritants, heights, and vibrations. To avoid exposure to infection, he can tolerate no public contact and only occasional interaction with coworkers and supervisors.

Based on vocational expert testimony, the ALJ concluded Owens could perform the requirements of representative light, unskilled occupations such as small products assembler, office helper, and mail clerk (non-postal). But the vocational expert agreed at the hearing that an individual of Owens' age, education and past work experience who, because of impairment, would be absent from the workday at least two working days per month could not sustain competitive employment.

9

The ALJ concluded Owens was not disabled.

## II. Discussion

Owens argues that the ALJ failed to recontact his treating physicians and so failed to develop the record, and did not properly weigh the opinion evidence. Therefore, Owens argues, the RFC is not based on substantial evidence on the record as a whole.

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byers v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

All medical opinion evidence, regardless of source, is weighed by examining the length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability of the opinion including medical signs and laboratory findings, consistency with the record as a whole, specialization of the medical source, and other factors such as the source's understanding of the disability programs. 20 C.F.R. § 404.1527; 20 C.F.R. § 404.927.

If a treating physician's opinion concerning the nature and severity of a claimant's impairment "is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in [the] case record," it is given

10

"controlling weight." 20 C.F.R. § 404.1527. "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation omitted).

Generally, the opinion of a consulting physician who examines a claimant only once is not considered substantial evidence, especially if the treating physician contradicts the consulting physician's opinion. *Charles v. Barnhart,* 375 F.3d 777, 783 (8th Cir. 2004) (*citing Lauer v. Apfel,* 245 F.3d 700, 705 (8th Cir. 2001), and *Onstead v. Sullivan,* 962 F.2d 803, 805 (8th Cir. 1992)). But an ALJ may consider the opinion of a consulting examiner "as one factor in determining the nature and severity of a claimant's impairment." *Charles,* 375 F.3d at 783 (*citing Harris v. Barnhart,* 356 F.3d 926, 931 (8th Cir. 2004), and 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)).

In reversing the first decision denying Owens benefits, the Appeals Council stated that recontacting the treating physicians, Drs. Kaufman and Shunyakov, for clarification of their opinions appeared necessary. But the ALJ did not do so, on the basis that the regulations had changed, so as to permit discrepancies to be resolved by means of other evidence. *See* 20 CFR 414.1520b and 416.920b. The ALJ then proceeded to give their opinions little weight.

The regulations, even with the changes, do not prohibit an ALJ from contacting treating physicians for more information. And this case—in which the ALJ rejected the opinions of treating physicians well-familiar with the claimant, in favor of the opinions of

11

an examining consultant and a non-examining consultant who are not—is the kind of case in which, as the Appeals Council suggested, recontacting the treating physicians would have been appropriate. The ALJ described the treating physicians' opinions as meaningless, because they did not explain what they meant by activities of daily living. But recontacting them would be the most expedient way to resolve the issue.

The ALJ also stated that Drs. Kaufman and Shunyakov's opinions were inconsistent with Dr. Bonucchi's records, containing Owens' self-reports of the ability to independently perform functions including driving walking, shopping, housekeeping, using the toilet, making doctor appointments, and socializing. It is not clear whether Dr. Bonucchi's record and Drs. Kaufman and Shunyakov's opinions are actually in conflict. Dr. Bonucchi's record is from an April 2010 visit. In October 2010, Dr. Bonucchi stated he would no longer treat Owens due to non-payment, and in November 2011, Dr. Bonucchi stated he could not opine regarding Owens' status because he had not seen Owens in a year. [Tr. 794, 934.] In contrast, Drs. Kaufman and Shunyakov saw and treated Owens more recently than Dr. Bonucchi did. Owens had a lengthy treatment relationship with Dr. Kaufman in particular. Drs. Kaufman and Shunyakov opined regarding Owens' fatigue, need for treatments, compromised immune system, recurrent pneumonia, and brittle diabetes. Drs. Kaufman and Shunyakov should have been recontacted so that it could be determined whether a dispute existed and if so, how to resolve it, such that the record could be clarified and developed.

Further, the ALJ did not give good reasons for the weights he assigned the medical opinion evidence. The ALJ pointed out as an "initial[]" matter that Dr. Kauffman is a

family practitioner. [Tr. 22.] The ALJ does not explain why a family practitioner is not qualified to render an opinion worthy of even some weight in this case. Even if the Court agreed that a family practitioner is not so qualified, which the Court does not, the ALJ fails to explain why the opinion of Dr. Shunyakov, an oncologist and hematologist, would not then be entitled to at least some weight.

The ALJ also states, inconsistently, that Dr. Kaufman appeared to base her opinion solely on Owens' subjective complaints, <u>and</u> that, "[i]n fact, Dr. Kaufman based her opinion largely on a diagnosis of cystic fibrosis, which has been disproved by genetic testing." [Tr. 22.] The records show that Dr. Kaufman did not base her opinions solely on objective complaints. She examined Owens; ordered tests such as a chest x-ray, sputum culture, and stress test; prescribed treatment; and followed up with him. And she does not mention cystic fibrosis in her opinions.

Drs. Kaufman and Shunyakov rendered opinions that are consistent with one another. The opinions also appear to be consistent with the medical records as a whole. Since the alleged date of onset, Owens has a lengthy history of complaints of fatigue; numerous and regular doctor visits relating to his lung issues and diabetes, and numerous treatments; hospitalization related to lung issues; and testing related to his lung issues. Consistent with Drs. Kaufman and Shunyakov, Owens' pulmonologist, Dr. Hargis, stated that Owens has significant asthma, requiring frequent treatment and occasional hospitalizations.

In short, the ALJ did not give good reasons for giving the treating physicians' opinions little weight. To the extent their opinions were unclear, they should have been

13

recontacted.

The ALJ placed significant and greatest weight on the opinions of the consulting experts, Drs. Velez and McKenna, respectively. The ALJ does not give good reasons for doing so. Dr. Velez examined Owens once, and Dr. McKenna did not examine him at all. Generally, the opinion of a consulting physician who examines a claimant only once is not considered substantial evidence, especially if the treating physician contradicts the consulting physician's opinion. *Charles,* 375 F.3d at 783, and *Onstead,* 962 F.2d at 805. Dr. Velez's only physical finding on the day of the examination was wheezing. Dr. Velez found some functional limitations, which the ALJ did not follow, instead applying greater functional limitations. Contrary to all other opinion evidence, Dr. Velez found environmental limitations not applicable, and the ALJ applied environmental limitations. Consistent with the opinions of Drs. Kaufman and Shunyakov concerning fatigue, Dr. Velez found that Owens' stamina is very much affected as a result of his bronchiectasis and shortness of breath, especially in labor-intensive environments. On the record as a whole, Dr. Velez's opinion is not substantial evidence demonstrating Owens is not disabled.

Dr. McKenna did not examine Owens at all. The ALJ explained that he gave Dr. McKenna's greatest weight because the doctor "demonstrated familiarity with the evidence of record, is a board-certified specialist in pulmonary diseases, and testified as an impartial expert witness." [Tr. 23.] But medical opinion evidence is weighed by examining the length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability of the opinion including medical

signs and laboratory findings, consistency with the record as a whole, specialization of the medical source, and other factors such as the source's understanding of the disability programs. 20 C.F.R. § 404.1527; 20 C.F.R. § 404.927. The ALJ did not weigh Dr. McKenna's opinion as provided by regulation, although it was the ALJ's job to do so.

On remand, the expert opinions should be reevaluated and an explanation provided concerning the weight given such evidence. Mere labels are not sufficient.

Because this case is being remanded so that the treating physicians can be recontacted for clarification and the evidence can be appropriately evaluated, the Court will also note that the ALJ must avoid picking and choosing from the record. For example, in discounting Owens' concerns about exposure to life-threatening infection, the ALJ states that Owens had leukemia as a teenager and underwent a bone marrow transplant, contracted a fungal infection, and underwent surgical removal of part of his lung—treatments that occurred in the late 1990's. The ALJ then concludes, "[Owens'] immune system has long recovered from these crises … and his leukemia is in full remission[.]" [Tr. 20.] Although there is no record of relapse of leukemia, the record does show that healthcare providers have diagnosed Owens as immunocompromised since those treatments, *i.e.*, Dr. Kim in 2009, and Dr. Kaufman in 2011. Additionally, during Owens' March 2012 hospitalization, Melissa Kouba, M.D., diagnosed him as having recurrent infections. As another example of picking and choosing, the ALJ states that Owens was diagnosed with pneumonia in 1999, "but not thereafter." [Tr. 21.] However, the record shows Owens was diagnosed with and treated for pneumonia in March 2009 by Dr. Kim and in September 2011 by Dr. Kaufman; and for possible

15

developing pneumonia in April 2012 during a hospitalization. The entirety of the record must be evaluated, not only parts of it.

## III.     Conclusion

The Commissioner's decision is reversed and the case remanded for further proceedings consistent with this Order.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated:   February 10, 2015  
Jefferson City, Missouri